IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

  Vs.                          No.  06-40129-01-SAC

JAVIER GARCIA-MEDINA,

        Defendant.

MEMORANDUM AND ORDER

      The case comes before the court on the defendant's pretrial motion to suppress evidence found in the pickup truck which he was driving on September 22, 2006.  (Dk. 14).  The government has filed a response opposing the motion. (Dk. 15).  The parties presented evidence and oral argument in support of their positions on March 1, 2007.  Having reviewed all matters submitted and having researched the relevant law, the court is ready to rule on the motions.

**INDICTMENT**

      The defendant Javier Garcia-Medina is charged in a single count indictment with violating 21 U.S.C. §  841(a)(1) on September 22, 2006, in the District of Kansas, by possessing with the intent to distribute 5.75 kilograms of cocaine.

**FACTS**

Around 1:00 p.m. on September 22, 2006, Deputy Cory Doudican a certified canine handler with the Lyon County Sheriff's Office was parked in his patrol vehicle, a 2004 Chevrolet Tahoe, at the Kansas turnpike exit for Emporia.  He was observing traffic when he noticed a teal green Chevrolet extended cab truck drive through the toll gate.  He could not read the back license plate on the truck as it passed his observation point.  As captured on the video recording, Deputy Doudican immediately started following the truck with his patrol vehicle and came within two to three car lengths of the truck.  Still unable to read the state name on the license plate from this position, the Deputy activated his emergency lights. The truck pulled over to the shoulder of the road between mileposts 127 and 128 on I-35 in Lyon County, Kansas.

Exiting his patrol vehicle and approaching on foot, he was able to "make out" that the state name on the license plate was Illinois.  The video recording shows the Deputy looking at the license plate as he walked between the vehicles approximately within five to ten feet of the license plate.

A photograph taken sometime later from a position directly

2

behind the truck shows a black frame around the license plate obscuring the state name and making it difficult to read.  This dealer's frame covers most of the top half of the state name.  Large white letters on that section of the black frame extend over the license plate.

At the hearing, Deputy Doudican testified that the height of this patrol vehicle may have contributed to his inability to read the state name on the license plate.  Deputy Doudican never was asked to explain his opinion.  From its subsequent viewing of the video recording of the traffic stop and the photograph of the license plate admitted at the hearing, the court finds nothing that visually confirms a factual basis for the deputy's opinion.  The video recording never shows the hood of the patrol vehicle to have ever blocked the deputy's vision of the truck's license plate.  Nor does the video recording evidence anything about the height or angle of the deputy's viewpoint to have interfered with seeing the license plate.  In fact, the license plate on the truck appears higher off the ground than most license plates typically mounted on passenger cars.  The height of the patrol vehicle could not have contributed substantially or significantly to the deputy's inability to read the state name on the truck's rear license plate.

As Deputy Doudican walked to the truck's passenger door, he

smelled antifreeze and noticed a liquid coming from underneath the truck. The deputy testified that the scope of his traffic stop now included determining whether the vehicle could safely continue on the highway and whether the driver was aware of this safety issue.  The deputy decided to process the traffic stop first before addressing the vehicle safety issue. The deputy explained to the defendant the reason for the stop was the illegible license plate.

The deputy asked for the defendant's license, registration and proof of insurance.  The defendant produced an Arizona driver's license. Because of the Illinois license plate, the deputy asked whether the defendant owned the truck.  The defendant said he was buying the truck from a good friend in Illinois, so the deputy asked for the friend's name. The defendant answered that he knew his friend's nickname only.  During this exchange, the defendant appeared excessively nervous, as the deputy could see the defendant's arm visibly shaking.  The defendant told the deputy that he was taking the truck back to his friend in Chicago, as he didn't want the truck anymore.  The deputy noticed a prepaid cell phone on the seat next to the defendant.  The defendant placed the phone in his breast pocket after seeing the officer notice it.  The deputy testified that

4

prepaid phones are commonly used in drug trafficking trips because they are untraceable.  The deputy inquired about the length of the defendant's expected stay, and the defendant said one week.  The deputy observed that the single piece of small luggage in the truck was inconsistent with such travel plans.  The deputy also noticed that the defendant completely avoided making any eye contact which is atypical behavior during a normal traffic stop.  The deputy saw a tool set on the floor board.

At this point, Deputy Doudican was suspicious that the vehicle contained contraband based on the above following factors:  the defendant's excessive nervousness and lack of eye contact, the unlikelihood of someone with a Arizona driver's license driving a vehicle registered in Illinois, the defendant's inability to recall his friend's name who was selling him the truck, the smell of antifreeze and presence of a fluid apparently leaking from the engine, the small amount of luggage for the stated travel plans, and the presence of a boost phone which the defendant placed in his front pocket upon the deputy noticing it.

The deputy radioed dispatch with the Illinois registration and license information.  Deputy Doudican then instructed the defendant to roll up the truck's windows and step out of the truck and stand some distance

from the truck as he would be deploying his drug-detection canine along the truck's exterior.  As he was taking his dog from the patrol vehicle, Deputy Doudican learned from the dispatch that the Illinois registration was not on file.  While waiting for dispatch to complete the other computer checks and to provide him with those results, the Deputy walked his dog around the truck and observed alerts at the front and rear of the truck.  The dog alerts occurred less than four minutes after the Deputy finished providing dispatch with the information needed for the computer check on the defendant and the registration and license.  With the assistance of a Kansas Highway Patrol trooper, the deputy searched the truck finding evidence of a hidden compartment in the radiator.  Escorted by both officers, the defendant drove the truck to an automobile repair shop where the radiator was removed and five packages of cocaine were found inside of the radiator.

**RELEVANT LAW AND ANALYSIS**

<u>Standing</u>

The government contends the defendant lacks standing in that he cannot prove lawful possession of the vehicle.  The title of the vehicle found in the passenger compartment is open in that it lacks an owner's

signature, and the defendant's name does not appear on it.  The defendant

was unable to tell the deputy the truck owner's full name and identified him

only by his nickname and as being a friend.  The defendant said he was

taking the truck back to his friend, since he no longer wanted it.

       "To establish standing to challenge a car search, the defendant

bears the burden of showing that he had a legitimate possessory interest in

or a lawful control over the car."  *United States v. Valdez Hocker*, 333 F.3d

1206, 1209 (10th Cir. 2003) (quotation and citation omitted).  Put another

way, the proponent bears the burden of establishing "that he gained

possession from the owner or someone with authority to grant possession."

*United States v. Arango*, 912 F.2d 441, 445 (10th Cir. 1990), *cert. denied*,

499 U.S. 924 (1991).  The defendant has not carried his burden of showing

standing to challenge the actual search of the vehicle.  Mere possession of

the car and its keys does not suffice to establish a legitimate possessory

interest.  *United States v. Martinez*, 983 F.2d 968, 973 (10th Cir. 1992),

*cert. denied*, 507 U.S. 1056 (1993).  In light of the open truck title, the

defendant's inability to provide the full name of the truck's owner, and the

defendant's story that he was taking the truck back to the owner, the court

is not persuaded that the defendant lawfully and legitimately possessed the

truck on the day in question.  Thus, the defendant lacked an "objectively reasonable" expectation of privacy in the truck.  *United States v. Gama-Bastidas*, 142 F.3d 1233, 1239 (10th Cir. 1998).

While the defendant lacks standing to challenge the eventual search of the vehicle, he does have standing to claim that the initial stop and ensuing detention were unlawful and that the subsequent search and seizure of evidence was the fruit of an unlawful detention.  *See United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162-64 (10th Cir. 1995).  This ruling does not appear to impact the defendant's motion, as his arguments focus principally on the lawfulness of the stop and the scope of the subsequent detention.

### Initial Stop

A traffic stop is a seizure under the Fourth Amendment.  *United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003).  Routine traffic stops are analyzed under the same investigation detention principles set out in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  The reasonableness of a traffic stop is determined from the dual inquiry whether "the officer's action was justified at its inception," and whether the officer's action "was reasonably related in

scope to the circumstances which justified the interference in the first place." *United States v. Ledesma*, 447 F.3d 1307, 1312 (10th Cir. 2006) (quotations and citations omitted).

"An initial traffic stop is valid under the Fourth Amendment not only if based on an observed traffic violation, but also if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Hunnicutt*, 135 F.3d at 1348 (citation omitted).   That the deputy is part of a drug task force and is assigned and trained to work with a drug-detection dog does not matter, for the subjective motive of the deputy in enforcing the traffic laws is irrelevant. *See Whren v. United States*, 517 U.S. 806, 818 (1996).  The first prong simply entails determining "whether the particular officer had reasonable suspicion that the particular motorist violated 'any of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *United States v. Hunnicutt*, 135 F.3d at 1348 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).  For there to be reasonable suspicion of wrongdoing, the facts known to the officer must have provided him with "a particularized and objective basis for suspecting legal wrongdoing." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003)

9

(quotations and citations omitted); *see United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).  "The evaluation is made from the perspective of the reasonable officer, not the reasonable person."  *Quintana-Garcia*, 343 F.3d at 1270 (italics omitted).  A reasonable suspicion is "more than an inchoate and unparticularized suspicion or hunch," is "considerably less than . . . a preponderance of evidence, and is "only a minimal level of objective justification."  *Edgerton*, 438 F.3d at 1047.

In his filed motion, the defendant summarily asserts the initial stop was invalid and alleges only that Deputy Doudican did not have a "clear view of the license plate" because of the "the exaggerated height of the [patrol] vehicle."  (Dk. 14, p. 2).  The defendant appears to argue alternatively that because the Deputy "plainly was able to read that the state was 'Illinois'" after exiting the vehicle, the Deputy should have concluded the stop without any further contact with the defendant.  (Dk. 14, p. 5).  The defendant does not frame either the allegation or the argument within any applicable cited legal authority.

Kansas law, K.S.A. § 8-133, requires a license plate to be displayed on the vehicle "in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be

10

clearly legible."[1]  "'A tag is "clearly legible" on a moving car if it is capable of

being ready by an officer in a car immediately following a safe distance

behind.'" *United States v. Rubio-Sanchez*, 2006 WL 1007252, *1 (D. Kan.

2006) (quoting *United States v. Granados-Orozco*, 2003 WL 22213129 (D.

Kan. 2003) (and citing *see State v. Hayes*, 8 Kan. App. 2d 531, 660 P.2d

1387, 1389 (1983) ("The statutory requirement for displaying a legible

license plate is for the purpose of permitting officers to conduct routine

license plate checks."))); *cf. United States v. Hsiung*, 2006 WL 118283, *3

(W.D. Okla. Jan. 13, 2006) (frame obscured bottom portions of tag, and

court held "the test is not whether the court can clearly read the tag based

on a static photograph, but whether a reasonable officer in Wall's

position–that is traveling at 70 miles per hour on a highway–could believe

that a violation of Oklahoma statutes was occurring."); *United States v.*

_____

[1]The key terms of K.S.A. § 8-133 are nearly identical to the terms
found in the Illinois counterpart:

> "Every registration plate shall at all times be securely fastened . . ., in
> a place and position to be clearly visible and shall be maintained in a
> condition to be clearly legible, free from any materials that would
> obstruct the visibility of the plate, including, but not limited to, glass
> covers and tinted plastic covers.  Clear plastic covers are permissible
> as long as they remain clear and do not obstruct the visibility of the
> plates."

625 Ill. Comp. Stat. 5/3-413 (2006).  The Illinois statute in expressly
prohibiting plate covers that obstruct visibility offers an example of foreign
materials interfering with the legibility of a plate.

*Walton*, 2004 WL 3460842, *4 (M.D. Tenn. Nov. 12, 2004) (frame blocked

name of state and state's insignia "is too small to recognize from a

distance."); K.S.A. § 8-1706(c) ("Either a tail lamp or a separate lamp shall

be so constructed and placed as to illuminate with a white light the rear

registration plate and render it clearly legible from a distance of fifty (50)

feet to the rear.").

The Kansas Court of Appeals decision in *State v. Hayes* stands

as the leading Kansas appellate court decision interpreting and applying

K.S.A. § 8-133.[2]  The facts in *Hayes* resemble the instant case in that a law

enforcement officer stopped an out-of-state vehicle because the issuing

state's name on the registration plate was not legible:

> While this statute does not specifically state that the state name
> must be visible when a license plate is displayed, it does state that
> the tag must be "legible."  We read this to mean that *all* of the tag
> must be legible, including the state name, which may be the most
> important information on the tag.

---

[2]The Tenth Circuit in *United States v. DeGasso*, 369 F.3d 1139 (10th
Cir. 2004), lays out a federal court's approach in interpreting state law:
> "It is axiomatic that state courts are the final arbiters of state law . . . .
> Where no controlling state decision exists, the federal court must
> attempt to predict what the state's highest court would do . . . .  If the
> state supreme court has not interpreted a provision, the federal court
> must predict how the court would interpret the code in light of state
> appellate court opinions, decisions from other jurisdictions, statutes,
> and treatises . . . ."

369 F.3d at 1145 (quotations and citations omitted).

. . . .
. . . The purpose of requiring display of a tag in the first place, and legibility of the tag displayed, is demonstrated by the very occurrence here.  The obscured tag frustrated the officers in a routine license plate check.  Law enforcement officials frequently must determine from tag numbers whether a vehicle is stolen; whether it is properly registered; or whether its occupant is suspected of a crime, is the subject of a warrant, or is thought to be armed.  Out-of-state cars on Kansas highways are subject to the same police imperative as local vehicles.

We conclude that the display of an illegible or obscured vehicle tag is a violation of K.S.A. 8-133 even if the vehicle is duly licensed in another state.  Such a violation is a misdemeanor under K.S.A. 8-149.

The trial court, in addition to finding 8-133 inapplicable to foreign vehicles, found that the legible legend "The Hoosier State" was sufficient state identification to excuse the obscured "Indiana." We think it asks too much of the average citizen, police officer or not, to hold him strictly accountable for knowing that the Hoosier state is Indiana.  Many may know this, or other state nicknames, but some will not.  Officer Duer testified he did not.  On this issue we think the covering of the state name on a vehicle's license tag renders the tag illegible within the prohibition of K.S.A. 8-133, despite the fact that the state's nickname is legible.

8 Kan. App. 2d at 532-33.  In accordance with *Hayes*, a foreign vehicle though duly licensed in another state may be found to be operating in violation of K.S.A. § 8-133 in Kansas if the issuing state's name is illegible or obscure to a reasonable officer in a reasonable position to conduct a routine license plate check.

The court considers the Deputy's conclusory testimony about the height of the vehicle affecting his vision to be unclear and inexplicable.

The video does not demonstrate that the height of the patrol car caused or substantially contributed to the Deputy's inability to read the license plate. There is nothing of record to suggest that the riding height of Deputy Doudican's vehicle was beyond what would be objectively reasonable to expect from a patrol vehicle.  The photograph of the license plate evidences that the size, position, color and lettering on the dealer's frame so obscured the state name such that a reasonable person would need to be standing within a short distance to read the state name.  The state name on this license plate is not clearly legible to a reasonable officer patrolling at a safe distance and wanting to conduct a routine license check.  Thus, Deputy Doudican lawfully stopped the truck as he had a particularized and objective basis for suspecting that the truck's display of the license plate violated K.S.A. 8-133.  *See United States v. Edgerton*, 438 F.3d at 1048.

Scope and Duration of Traffic Stop

"Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'"  *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).  Once the initial justification for a traffic stop has

14

concluded, the officer typically must allow the driver to leave . *United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir.1999).  "An 'investigative detention usually must "last no longer than is necessary to effectuate the purpose of the stop," and "[t]he scope of the detention must be carefully tailored to its underlying justification."'"  *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003)  (quoting *United States v. Hunnicutt*, 135 F.3d at 1349 (quoting in turn *Florida v. Royer*, 460 U.S. at 500)), *cert. denied*, 541 U.S. 911 (2004).  An officer conducting a traffic stop may request a vehicle registration or other proof of authority to operate the vehicle, a driver's license, and proof of insurance and then run a computer check on the car and driver from this information.  *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003); *United States v. Mendez*, 118 F.3d 1426, 1429 (10th Cir. 1997).  An officer may detain the driver and vehicle for that time reasonably necessary to complete these checks and issue a citation or warning.  *Cervine*, 347 F.3d at 871.  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

The defendant challenges that the justification for the initial stop

dissipated once Deputy Doudican, while on foot and within approximately ten feet or less of the license, was able to determine the issuing state's name.  The defendant contends that at this point "[t]he scope of the stop could have been concluded without any contact with Mr. Garcia" but that the deputy continued with the traffic stop.  (Dk. 14, p. 5).  Though the defendant does not cite any authority for his position, the government understands the defendant's contention to be an effort to employ the Tenth Circuit's recent holding of *United States v. Edgerton*, 438 F.3d 1043 (10th Cir. 2006).

In *Edgerton*, the Tenth Circuit addressed whether an officer "unlawfully extended the duration of the stop (and her detention) beyond its limited scope once he identified the posting in the rear window of Defendant's vehicle as a valid Colorado temporary registration tag."  438 F.3d at 1048.  The defendant in *Edgerton* argued for applying *United States v. McSwain*, 29 F.3d 558, 561-62 (10th Cir. 1994), which held that an officer who stopped a motor vehicle to determine the validity of a temporary registration tag could not extend the stop after approaching on foot and determining the tag to be valid.  The government argued for distinguishing *McSwain* in that the officer in *Edgerton* had stopped the

16

vehicle not just to check the validity of the temporary tag but to enforce

K.S.A. § 8-133 on an unlawfully displayed temporary tag.  The panel in

*Edgerton* did not overrule its precedent which had distinguished *McSwain*

on the factual grounds argued by the government[3] but held that the

government could not rely on this distinction as the temporary registration

display did not violate K.S.A. § 8-133.  Thus, it remains the rule in this

Circuit that an officer may detain a driver and continue with the traffic stop

for displaying a registration plate in violation of K.S.A. § 8-133 "'even after

[he] approache[s] the [vehicle] and . . . [is] able, at that point, to read it.'"

*United States v. Ledesma*, 447 F.3d at 1314 (quoting *United States v.*

*DeGasso*, 369 F.3d at 1149).

        The precedential value of *Edgerton* opinion is two-fold.  First, as

far as its interpretation and application of K.S.A. 8-133, the *Edgerton*

---

        [3]*See, e.g., United States v. DeGasso*, 369 F.3d 1139 (10th Cir. 2004)
(Unlike *McSwain*, the violation here was "that the lettering on the license
plate was not 'clearly visible,' which remained true even after the trooper
approached the truck and was able, at that point, to read it."); *United States
v. Poke*, 81 Fed. Appx. 712, 714-15, 2003 WL 22701661 (10th Cir. Nov.
17, 2003) (Because the officer could not see the vehicle's temporary tag as
it traveled along the interstate, the officer "continued to have an objectively
reasonable suspicion that a traffic violation was occurring.")  Indeed, the
district court in *Edgerton* had distinguished *McSwain* on those same
grounds.  *United States v. Edgerton*, 2004 WL 2413553 at *9 (D. Kan. Sep.
9, 2004), *on reconsideration*, 2004 WL 2457806 at *1 (D. Kan. Oct. 14,
2004).

decision is limited to its holding that "there is no violation of K.S.A. 8-133 when a temporary registration tag is posted in the rear window and the 'only reason' for it not being legible is the nighttime conditions."  *United States v. Rubio-Sanchez*, 2006 WL 1007252 at *4 (D. Kan. Apr. 17, 2006) (quoting *Edgerton*, 438 F.3d at 1050).[4]  In *Ledesma*, the Tenth Circuit subsequently said as much, "[t]he decision in *Edgerton* rested on the conclusion that § 8-133 does not criminalize a 'wholly unremarkable' temporary registration simply because a vehicle is traveling at night."  447 F.3d at 1313.  Consequently, the court believes the *Edgerton* decision cannot be reasonably read as holding that a license plate is "clearly visible" and "clearly legible" under K.S.A. § 8-133 so long as the officer is able to

---

[4]This court in *Rubio-Sanchez* analyzes the *Edgerton* decision at greater length.  In that decision, the district court reads *Edgerton's* comments concerning external conditions beyond a defendant's control as simply the Circuit's "general appeal" to the "reasonableness" of reading "Colorado's regulatory exception for temporary tags into K.S.A. § 8-133." 2006 WL 1007252 at *4.  The district court justified its narrow reading of *Edgerton* in this way:

> "This narrow construction of that discussion comports with what the court has said above on the Tenth Circuit's analysis and, more importantly, with the Tenth Circuit did not say about Kansas law when it referred to 'external conditions' and the defendant's 'control.' Without more direction from the Tenth Circuit, this court eschews any pretense of amending K.S.A. § 8-133 or any other Kansas traffic law to accommodate this unreferenced discussion of 'external conditions' and 'control.'"

*Rubio-Sanchez*, 2006 WL 1007252 at *4.

see and read the license plate from a standing position several feet away.

Second, the *Edgerton* decision reaffirms the holding from *McSwain* that an

officer upon seeing the temporary tag is valid and having no other

reasonable suspicion of a traffic violation may only explain "the reason for

the initial stop" and then must allow the driver "to continue on her way

without requiring her to produce her license and registration."  438 F.3d at

1051.

     *Edgerton's* unique interpretation and application of K.S.A. § 8-

133 is not relevant to this case.  There is no temporary tag involved here.

Deputy Doudican stopped the vehicle shortly after noon under normal

atmospheric conditions.  The license plate was obscured by a dealer's

frame which is not an external condition beyond the defendant's ability to

control.  Deputy Doudican's reasonable suspicion that the obscured license

plate was in violation of K.S.A. § 8-133 did not dissipate once he

approached on foot and was able then to determine the state's name.

Deputy Doudican did not exceed the lawful scope of his authority in

continuing the traffic stop based on this violation of Kansas law.

     The defendant's memorandum further complains that Deputy

Doudican's questions and requests during the traffic stop were not

reasonably related to the reason for the traffic stop.  There is no evidence

of the Deputy exceeding the scope of the stop in his requests for

documentation.  An officer may request a driver's license, vehicle

registration, proof of insurance, and other relevant documentation.  *See*

*United States v. Gregoire*, 425 F.3d 872, 878-79 (10th Cir. 2005).  During

this production of documents and the completion of subsequent computer

checks, the officer's questioning need not be restricted to particular topics

so long as it does "not appreciably lengthen" the driver's detention or

extend  the detention "'beyond the time reasonably required to complete

that [task]."  *United States v. Alcaraz-Arrellano*, 441 F.3d 1252, 1259 (10th

Cir. 2006) (quoting *Illinois v. Caballes*, 543 U.S. 405, 125 S. Ct. 834, 837

(2005)); *see also United States v. Wallace*, 429 F.3d 969, 974 (10th Cir.

2005) ("[M]ere police questioning does not constitute a seizure under the

Fourth Amendment.") (citing *Muehler v. Mena*, 544 U.S. 93, 125 S. Ct.

1465, 1471 (2005)).  The Deputy's several questions to which the

defendant objects did not unreasonably prolong the time needed to

complete this lawful traffic stop.

   Finally, the defendant concedes that an officer may deploy a

drug-detection canine during a lawful traffic stop, but he alleges that

20

Deputy Doudican purposefully delayed in contacting dispatch in order to deploy the drug-detection canine.  The evidence at the hearing contradicts this allegation.  After obtaining the defendant's license and documentation and asking several questions related to ownership of the truck, travel plans and occupation, Deputy Doudican went to his patrol vehicle and immediately contacted dispatch with the information needed for a computer check.  The undisputed evidence is that the Deputy deployed his dog while waiting for the results of the computer check.  As found above, the dog alerts occurred less than four minutes after the Deputy finished providing dispatch with the information needed for the computer check.  The court finds that the defendant's allegation of purposeful delay is baseless.

Alternatively, the court finds that Deputy Doudican had reasonable suspicion to extend the stop in order to deploy the canine.  The factors identified in Doudican's testimony above would support reasonable suspicion for extending traffic stop for a canine sniff.  In reaching this conclusion, the court has assessed the totality of the circumstances, without pigeonholing facts as suspicious or not and while "giv[ing] deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances."  *United States v.*

21

*Mendez*, 118 F.3d at 1431.   The truck's Illinois license plate and the defendant's Arizona driver's license raised suspicion which heightened after the defendant's implausible explanation.  The defendant first said he was buying the vehicle from a friend in Illinois and then said he was returning it to his friend because he no longer wanted it.  When the Deputy asked for the friend's name, the defendant looked about the truck for papers and then said he knew only the nickname of his friend, not his full name.  The defendant did not produce any documentary proof of his ownership.  Just before the deployment of the drug dog, the computer check returned no records to indicate that car had a valid registration.  A lack of proof of ownership or authority to operate a vehicle is a factor that justifies a reasonable detention and further questioning. *See, e.g., United States v. Nichols*, 374 F.3d 959, 965 (10th Cir. 2004), *cert. granted and vacated on other grounds*, 543 U.S. 1113 (2005).  During the stop, the Deputy's suspicion was heightened also by several other circumstances. The driver displayed extreme nervousness and avoided making any eye contract with the Deputy.  The defendant also acted suspiciously in putting the prepaid cell phone in his pocket after seeing the Deputy notice it on the front seat.  The Deputy testified that the drug traffickers frequently use

22

prepaid cell phones, as they are not traceable.  The Deputy noticed the vehicle was leaking a fluid and he smelled antifreeze.  The small amount of luggage was inconsistent with what the defendant said was the planned length of his stay.  The court is satisfied that these facts are collectively sufficient under the circumstances of this case to produce a particularized and objective basis for suspecting the defendant of criminal activity, as to justify any extension of the stop for deployment of the drug dog.

IT IS THEREFORE ORDERED that the defendant's motion to suppress evidence found in the vehicle in which he was driving on September 22, 2006, (Dk. 14) is denied.

Dated this 30th day of April, 2007, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge